UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JONATHAN ROSADO,

                                              Plaintiff,

      vs.                                                               9:09-CV-67
                                                                                     (DNH/ATB)
P. FESSETTO,[1]

                                              Defendant.
_____

JONATHAN ROSADO, Plaintiff pro se
DEAN J. HIGGINS, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[2]

In this civil rights complaint, plaintiff alleges that defendant Fessette failed to protect plaintiff from assault by another inmate. (Compl.) (Dkt. No. 1).[3] Plaintiff seeks substantial monetary relief. (Compl. ¶¶ 14-15).

Presently before the court is defendant's motion for summary judgment

---

[1] This defendant's name is actually Paul Fessette, and the court will refer to him by his proper name.

[2] The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 41).

[3] Plaintiff has attached his five-page, handwritten statement of facts, causes of action, and request for relief to a standard section 1983 complaint form. (Dkt. No. 1). Plaintiff's attachment contains numbered paragraphs, and the court will cite to this document using the paragraph numbers.

pursuant to Fed. R. Civ. P. 56, arguing both that plaintiff has failed to exhaust his administrative remedies and that his claim fails on the merits. (Dkt. No. 26). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

I.  **Facts**

   A.  **Plaintiff's Allegations**

By way of background, plaintiff states that on August 28, 2006, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was "cut behind his right ear" by an unknown inmate. (Compl. ¶ 1). Plaintiff alleges that the inmate who cut him then pushed plaintiff down the stairs and disappeared so that plaintiff could not identify him. *Id.* As a result, plaintiff was placed in Involuntary Protective Custody ("IPC"). *Id.* Plaintiff states that at the IPC hearing, he told the hearing officer that it was not a "smart idea" to put plaintiff back into General Population because he had "problems with the bloods." (Compl. ¶ 2).

Plaintiff was transferred to Clinton Correctional Facility ("Clinton") on September 29, 2006. Plaintiff claims that on October 1, 2006, he approached defendant Sergeant Fessette to inform him that plaintiff believed he was not safe at Clinton because of his conflict with a gang, known as the "Bloods." (Compl. ¶ 3). Plaintiff claims that defendant Fessette responded by asking plaintiff for information about the Bloods, but when plaintiff could not come up with any information, defendant Fessette told plaintiff that he could not do anything for him. (Compl. ¶ 4). Plaintiff states that he tried to explain to defendant Fessette that plaintiff had been cut

2

at Great Meadow by "members" of the Bloods, and that he wanted to be placed in Protective Custody ("PC") because he did not wish to be cut again. (Compl. ¶ 5).

Plaintiff claims that defendant Fessette told plaintiff that if he could not give him any information, he was "on his own." (Compl. ¶ 6). Plaintiff alleges that although he pleaded with defendant Fessette, the defendant merely walked away, stating that when plaintiff decided he could come forward with the information that defendant Fessette was "looking for," then he would put plaintiff in PC. *Id.*

Plaintiff claims that after having this discussion with defendant Fessette, plaintiff walked out into the recreation yard to telephone his family so that someone in his family could call the facility in an attempt to get plaintiff into PC. (Compl. ¶ 7). When plaintiff reached the yard, all the telephones were being used, and an officer told plaintiff that he could not stand by the telephones to wait. *Id.* Plaintiff claims that while he was "standing around" waiting for a telephone to be available, he was "cut by a light skin [sic] Blood member." *Id.* Plaintiff claims that while he and the other inmate were "fighting," someone "yelled police are coming," and the inmates "split up to avoid getting a fighting ticket." *Id.* Plaintiff states that he was examined due to all the blood on his face,[4] but that "the other guy got away." *Id.*

Plaintiff claims that he later refused Voluntary Protective Custody ("VPC") because he knew that he would be placed in IPC anyway because of his injury. (Compl. ¶ 8). Plaintiff believed that by refusing VPC, he would obtain protection in IPC, without being "labeled a 'snitch.'" *Id.* Plaintiff states that if he were to be

---

[4] Plaintiff sustained a nine-inch laceration on the right side of his face. (Compl. ¶ 10).

3

labeled a "snitch," he would be in danger throughout the twenty-five years of his sentence. (Compl. ¶ 9). Plaintiff states as his "Cause of Action," that defendant Fessette was deliberately indifferent to plaintiff's safety when he failed to institute an IPC proceeding after being notified by plaintiff that his life was in danger. (Compl. ¶ 13).

### B.   Defendant's Evidence

Defendant has submitted further information relative to the incident at Great Meadow and to the October 1st incident at Clinton that is the subject of plaintiff's allegations against defendant Fessette. Jeffrey A. Tedford is currently First Deputy Superintendent ("FDS") at Great Meadow, but was the Deputy Superintendent for Security ("DSS") at Clinton in October of 2006. (Tedford Aff. ¶ 2) (Dkt. No. 26-2). FDS[5] Tedford states that on August 28, 2006, plaintiff was cut by an unidentified inmate at Great Meadow. (Tedford Aff. ¶ 5). Following the incident, plaintiff refused to, or could not, identify his assailant and refused VPC. *Id.* Plaintiff signed a waiver stating that he did not need PC, and that he would inform corrections authorities if and when he did need protection. *Id.*

However, because of the injury and because of the uncertain circumstances surrounding the incident, the staff at Great Meadow recommended that plaintiff be placed in IPC. *Id.* Plaintiff was afforded an IPC hearing on September 1, 2006, and the hearing officer upheld the IPC recommendation. *Id.* The Superintendent at Great Meadow approved the placement. *Id.* FDS Tedford explains the difference between

---

[5] The court will refer to FDS Tedford by his current title.

4

VPC and IPC. (Tedford Aff. ¶ 6). Inmates may request VPC and must justify their request by either having been the victim of an assault or if they can identify a known enemy at the facility. *Id.* IPC is provided for inmates who do not request protection, but in the opinion of the corrections staff, are in need of protection for the same reasons that an inmate may himself request protection. *Id.* (*See also* Def.'s Ex. B, Dkt. No. 26-8).[6]

FDS Tedford states that in accordance with Department of Correctional Services ("DOCS") Directive No. 4948 and DOCS policy, plaintiff's status was reviewed for an "unscheduled transfer," to a facility where he could again be placed in General Population. (Tedford Aff. ¶ 7). After the review, it was determined that Clinton was an appropriate facility for plaintiff. *Id.* Plaintiff was transferred from Great Meadow to Clinton on September 29, 2006.[7] (Tedford Aff. ¶¶ 4, 7; *see also* Def.'s Ex. A, Chronological History Dsiplay). FDS Tedford states that when plaintiff arrived at Clinton, his disciplinary history was reviewed, and his IPC status was identified. (Tedford Aff. ¶ 8). The staff at Clinton, under FDS Tedford's supervision, determined that plaintiff could be moved back into General Population. (Tedford Aff. ¶ 9).

When he arrived at Clinton, plaintiff had no known enemies at the facility.

---

[6] Exhibit B is DOCS Directive No. 4948, together with various revisions of that Directive. (Dkt. No. 26-8. Ex. B). The document contains the definitions of VPC and IPC, together with the transfer policy, cited by defendant Fessette, that requires inmates placed in protective custody to be evaluated for transfer to a facility in which they can be placed in General Population. (Ex. B at 2-3).

[7] Plaintiff's transfer history indicates that plaintiff left Great Meadow and was admitted at Clinton on the same day. (Def.'s Ex. A, Dkt. No. 26–7).

(Tedford Aff. ¶ 10). FDS Tedford states that the staff at Clinton had no information whatsoever that inmate Ceruti, the inmate who attacked plaintiff at Clinton, posed any threat to plaintiff prior to their altercation on October 1, 2006, only two days after plaintiff arrived at the facility. (Tedford Aff. ¶ 12). If such information had been known to the staff, efforts would have been made to assess the situation and take action, if necessary, to separate the inmates and maintain the security of the facility. *Id.*

Defendant Fessette has also submitted an affidavit. (Fessette Aff., Dkt. No. 26-4). Defendant Fessette is a Corrections Sergeant at Clinton and was employed at Clinton on October 1, 2006. (Fessette Aff. ¶ 1). Defendant Fessette states that on October 1st, he was assigned as a housing sergeant, serving as the area supervisor for the B, C, D, and E Blocks as well as the special housing unit ("SHU") on the 2:00 p.m. to 10:00 p.m. shift. (Fessette Aff. ¶ 5). Defendant Fessette's duties would have included watching inmate movement through the blocks to which he was assigned and that this duty would have brought him into contact with a number of inmates. (Fessette Aff. ¶ 9). However, defendant Fessette does not specifically remember speaking with plaintiff. *Id.*

Defendant Fessette states that he was unaware of any threat to plaintiff prior to the October 1st altercation with inmate Ceruti. (Fessette Aff. ¶ 10). Prior to the incident, defendant Fessette did not even know inmate Ceruti. *Id.* Defendant Fessette asserts that he was unaware of any threat of harm to plaintiff on October 1st. However, even if plaintiff had expressed his concerns in the manner that he alleges in his

6

complaint, the general fear of the Bloods would not have demonstrated a specific threat of physical harm sufficient to recommend PC. (Fessette Aff. ¶ 11).

There is no dispute that an altercation took place between plaintiff and inmate Ceruti, and that plaintiff sustained a significant cut to the right side of his fact. (Fessette Aff. ¶ 12). After the altercation, defendant Fessette participated in the investigation of the fight and prepared a report of the incident. (Fessette Aff. ¶ 14). Defendant Fessette states that he spoke to plaintiff, and that during the interview, plaintiff stated that he was cut from behind and that the fight was the result of a "'beef out on the street.'" (Fessette Aff. ¶ 15). Following the fight, plaintiff refused VPC and signed a waiver to that effect. (Fessette Aff. ¶ 16). Based upon the nature of the incident and the injury sustained by plaintiff, defendant Fessette then made a recommendation that plaintiff be admitted to IPC. (Fessette Aff. ¶ 17).

As a result of defendant Fessette's recommendation, plaintiff was afforded an IPC hearing on October 4, 2006. (Def.'s R.7.1(a)(3) Statement, ¶ 20, Dkt. No. 26-5). A transcript of the hearing has been filed as Defendant's Ex. G. (Dkt. No. 26-13). During the hearing, plaintiff stated that he disagreed with the IPC recommendation because "[I] don't need IPC. It was a fight and I got cut we [sic] in prison. Things like that happen." (Def.'s Ex. G at 3).[8] Plaintiff denied that the person with whom he was fighting was the same person that cut him. *Id.* Plaintiff testified that it "was just a fight," and that he did not know the other inmate's motivation for the altercation. *Id.* at

---

[8] Defense counsel has numbered the pages of the Exhibit at the bottom right, and the court will use those numbers to refer to the pages of the Exhibit. The transcript itself has numbers at the bottom-center of the page that do not match the page numbers of the exhibit.

4. Based on the recommendation and plaintiff's statements at the very short hearing, the hearing officer found that the recommendation for IPC was substantiated. *Id.* The hearing officer also found that, because plaintiff claimed that the person who cut his face was not the inmate with whom he was fighting, and that there was no known motive, it would be difficult for the facility to "arrange for [his] care and custody in the normal course of events." *Id.* It was, therefore, determined that plaintiff needed to be separated from the general population for his own safety. *Id.*

## II.   Summary Judgment

Defendant moves for summary judgment, arguing both that plaintiff has failed to exhaust his administrative remedies regarding the failure to protect, and that his claim fails on the merits. This court agrees with both arguments and finds that summary judgment should be granted in favor of defendant.

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts

by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, the court does not resolve contested issues of fact, but must rather determine the existence of any disputed issues of material fact. *Salahuddin v. Coughlin*, 999 F.2d 526, 535 (2d Cir. 1998) (citations omitted). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272. To evaluate a fact's materiality, the substantive law determines which facts are critical and which are irrelevant. *Salahuddin v. Coughlin*, 999 F.2d at 535 (citing *Anderson v. Liberty Lobby*, 477 U.S. at 248). While the court must extend "extra consideration" to pro se parties, this does not relieve the pro se of his duty to meet the requirements necessary to defeat the motion. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). A pro se party's bald assertion, "completely unsupported by the evidence," is not sufficient to overcome a properly supported motion. *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.    **Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore*, 2005 U.S. Dist. LEXIS 6070, *12-15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004)). As an affirmative defense, it is the defendant's burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12-13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC).

10

N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

The Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.* As discussed below, this court finds that plaintiff has not shown that the exhaustion requirement should be excused, and thus, plaintiff's case should be dismissed regardless of whether exceptions to the exhaustion requirement continue to exist after *Woodford*.

In support of his argument that plaintiff has failed to exhaust his administrative remedies with respect to any claim that defendant Fessette failed to protect plaintiff from the October 1st assault, defendant submits the affidavit of Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton. (Brousseau Aff., Dkt. No.

11

26-3). IGP Supervisor Brousseau states that she has conducted a review of Clinton's Grievance Office Clerk's Log for the months of October, November, and December of 2006. (Brousseau Aff. ¶ 5). This Log contains "all grievances and appeals filed at Clinton . . . ." *Id.* IGP Supervisor Brousseau found "no record that inmate Rosado filed any grievance" relating to defendant Fessette's failure to protect plaintiff on October 1, 2006, and there was "no record" that plaintiff appealed any grievance determination to the Superintendent or to the CORC for any incident at Clinton. *Id.*

In his response to defendant's motion for summary judgment, plaintiff claims that he filed a grievance on October 3, 2006 with the IGRC, but never received a response. (Dkt. No. 33 at 5). Plaintiff claims that he then wrote a letter to the IGRC on October 22, 2006 and two letters to the Superintendent, one on October 23, 2006, and another dated October 28, 2006, complaining that he had not received a response to his grievance. *Id.* Plaintiff claims that he exhausted his administrative remedies when he failed to get a response from the prison officials. *Id.* Plaintiff claims that "Facility officers messed with Plaintiffs [sic] outgoing mail due to the seriousness of the injury and claim caused by Defendant failing to protect Plaintiff and issuing Protective Custody in [sic] which Plaintiff requested." *Id.*

Plaintiff attempts to support his claim by stating that a Southport[9] Correctional Facility IGRC representative, Ms. Vanhagen told plaintiff that "a lot of inmate grievances do not reach her through the mail for some reason," and that she "receives a lot of complaints about the mailroom [sic] interfering and tampering with inmate

---

[9] Plaintiff is currently incarcerated at Southport.

12

grievances that go through the mailroom [sic] which occurs in every facility in New York State." *Id.*  Thus, plaintiff is attempting to establish that he is entitled to raise the estoppel exception to the exhaustion requirement by stating that someone must have "messed" with his grievance and his mail.

Plaintiff does not attach any copies of the grievance or letters that he allegedly attempted to send.  Instead, plaintiff attaches two inmate declarations to his response. (Dkt. No. 33 at 11-12, 13-14).  The first statement is from inmate Corey Sloan, who states that he was the plaintiff in another failure-to-protect case against officers at Clinton. (Dkt. No. 33 at 11-12, ¶ 3).  Inmate Sloan states that he is making the declaration because he also had his grievances and mail tampered with at Clinton. *Id.* ¶ 2.  Inmate Sloan states that the case that he brought against the officers settled before trial.[10] *Id.*  The second declaration is from inmate Adrian Lopez, who states that he was incarcerated at Clinton between July 8, 2008 and November 3, 2008. (Dkt. No. 33 at 13-14, ¶ 3).  Inmate Lopez claims that during the time he was incarcerated at Clinton, he attempted to file grievances that were "never answered for some apparent reason." *Id.*  He states that he has witnessed other inmates having the same problem. *Id.* ¶ 4.

Courts have consistently held, however, that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g.*

---

[10] *See Sloan v. Artus*, 9:07-CV-951 (N.D.N.Y.) (DNH/RFT).  A review of the docket sheet in Inmate Sloan's case shows that he did receive a settlement of $ 3,000.00 as the result of assisted mediation, supervised by Recalled Magistrate Judge Victor Bianchini. (Dkt. No. 62 in 9:07-CV-951).  A review of inmate Sloan's amended complaint shows that in his amended complaint, he alleged that he filed a grievance, but was never given a decision. (Dkt. No. 19 ¶ 4(B)(i) & (ii)).

13

*Veloz v. New York*, 339 F. Supp. 2d 505, 515-16 (S.D.N.Y. 2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Willaims*, 186 F. Supp. 2d 353, 357 (S.D.N.Y. 2002) (same). *See also Murray v. Palmer*, 9:03-CV-1010, 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. March 31, 2010) (citations omitted). The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown*, 9:06-CV-20, 2010 WL 144400, at *19 & n.21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process.

In this case, therefore, plaintiff's claim that the Clinton officials must have "messed with" his grievance and his letters to the Superintendent is insufficient to excuse the exhaustion requirement. Plaintiff states that he filed a grievance on October 3, 2006. When he did not receive a response, he states he wrote a letter to the IGRC and two letters to the Superintendent, but when he did not hear from the Superintendent, plaintiff does not allege that he attempted to appeal to the CORC. Although plaintiff states that he served "Defendant" with copies of the letters and grievances, apparently plaintiff did not retain copies for himself because he has submitted no documents indicating that he attempted to file anything. The fact that

other inmates may have had problems with their grievances does not establish that plaintiff's problems were the same.

Plaintiff has shown no special circumstances to justify his failure to propely appeal to the CORC, even assuming that his attempts to exhaust at the first two levels were impeded by unknown corrections officials. Thus, plaintiff has failed to exhaust his administrative remedies against defendant Fressette, and plaintiff's complaint may be dismissed for failure to exhaust. However, even if the court were to excuse plaintiff's failure to exhaust, his claim also fails on the merits as discussed below.

## IV. Failure to Protect

In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, *10-11 (citing *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985)). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks

was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

In this case, plaintiff claims that defendant Fessette should be liable for failing to protect plaintiff from assault because plaintiff was in IPC at Great Meadow, where plaintiff had agreed to the IPC placement.[11] Thus, defendant Fessette should have taken plaintiff seriously when plaintiff told him that he was in danger. The DOCS Directive 4948 specifically states that inmates who are in IPC will be evaluated for transfer to facilities in which they can be programmed in General Population. (Def.'s Ex. B, DOCS Directive No. 4948(III)(A)). FDS Tedford states that after his placement in IPC at Great Meadow, plaintiff was evaluated, and it was determined that Clinton was an appropriate facility where plaintiff could be placed in General Population. (Tedford Aff. ¶ 7).

Upon plaintiff's arrival at Clinton, his IPC status was noted, but because he had no known enemies at Clinton, the staff, under FDS Tedford's supervision moved plaintiff into General Population. *Id.* ¶ 9. Defendant Fessette had no way of knowing otherwise. Plaintiff had only been at Clinton for two days when he allegedly approached defendant Fessette to inform him of the danger to plaintiff. Plaintiff claims that defendant Fessette asked plaintiff for more information about the potential

---

[11] Actually, the exhibits establish that plaintiff initially declined VPC, requiring the prison officials to hold an IPC hearing. By the time plaintiff was afforded his IPC hearing, he had changed his mind and elected to remain in protective custody. *Compare* (Tedford Aff. ¶ 5) *with* (Def.'s Ex. C, Dkt. No 26-9 at 4, 8, 9, 10).

danger. Although defendant Fessette does not remember such a conversation with plaintiff, even if defendant Fessette asked plaintiff to explain why he believed he was in danger, this does not indicate that defendant Fessette either failed to take plaintiff seriously or was deliberately indifferent to a substantial risk to plaintiff. Plaintiff claims that he was assaulted shortly after his conversation with defendant Fessette, while plaintiff was in the yard waiting to use the telephone.

Based on the undisputed facts, no rational trier of fact could find that defendant Fessette actually knew of and disregarded a risk to plaintiff. According to plaintiff's own description of the facts, so little time passed between the alleged conversation with Fessette and the assault that defendant Fessette would not have had time to confirm what plaintiff was telling him or to take other administrative steps necessary to move plaintiff into protective custody. Thus, even if plaintiff had exhausted his administrative remedies, this court would recommend dismissal on the merits.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 26) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: August 4, 2010

Hon. Andrew T. Baxter
U.S. Magistrate Judge